# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-490 consolidated with 24-492


**STATE OF LOUISIANA**

**VERSUS**

**DONALD BRIGGS, III**
**A/K/A DONALD BRIGGS**


**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILLION, NO. 69263
HONORABLE THOMAS J. FREDERICK, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***
ON REMAND FROM
THE LOUISIANA SUPREME COURT
NO. 2025-K-00529
**\*\*\*\*\*\*\*\*\*\***


**SHARON DARVILLE WILSON**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.


**AFFIRMED.**

**Aaron M. Meche**
**Assistant District Attorney**
**15th Judicial District, Vermilion Parish**
**100 N. State Street, Ste. 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P. O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Donald Briggs, III**

**WILSON, Judge.**

This matter comes before the court on remand from the Louisiana Supreme Court to consider the pretermitted assignments of error after the supreme court reversed this court's decision and reinstated the conviction and life sentence of Defendant, Donald Briggs, III, for second-degree murder. *State v. Briggs*, 25-529 (La. 5/1/26), 432 So.3d 167. For the following reasons, we affirm the conviction and sentence.

I.

**ISSUES**

We must decide:

(1) whether the prosecutor denied due process with false testimony; and

(2) whether Defendant was denied a fair trial when the court allowed a relative of the victim to sit on the jury.

II.

**FACTS AND PROCEDURAL HISTORY**

On July 14, 2022, Jazaylon Levy was shot while walking outside of an apartment in the Stone Bridge Apartment complex in Abbeville, Louisiana. He later died from his injuries. On October 31, 2022, Donald Briggs and his brother, Stefan Briggs, were each charged by a single grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1. A two-day jury trial commenced on August 29, 2023, after which both Donald and Stefan were found guilty as charged.

On September 26, 2023, Donald, through counsel, filed a motion for post-verdict judgment of acquittal and a separate motion for new trial. After hearing

testimony and evidence, the motions were denied by the trial court on March 28, 2024. After waiving sentencing delays, both Donald and Stefan were sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On April 8, 2024, Donald, through counsel, filed a notice of appeal. His trial counsel filed a separate motion to withdraw and appoint the Louisiana Appellate Project ("LAP"). On April 11, 2024, the trial court granted an appeal, and on April 29, 2024, the trial court granted counsel's motion to withdraw and appoint LAP.

This court reversed the convictions and sentences of both Defendants based on insufficient circumstantial evidence. *State v. Briggs*, 24-490 (La.App. 3 Cir. 4/2/25), 409 So.3d 399. The State appealed to the supreme court, which reversed this court's decision and reinstated the conviction and sentence for each Defendant. The supreme court found this court erred in substituting its verdict for that of the jury and remanded for this court to consider the pretermitted assignments of error. *Briggs*, 432 So.3d 167.

III.

### LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

There is a conflict between the sentencing minutes, Uniform Sentencing Commitment Order, and the transcript of sentencing. Both the minutes of sentencing and the Uniform Sentencing Commitment Order state the trial court ordered Donald's sentence to run concurrently with any other sentence he was presently serving. No such statement, however, is reflected in the transcript. This conflict is to be resolved in favor of the transcript. *See State v. Wommack*, 00-137 (La.App. 3

2

Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Thus, the sentencing minutes and commitment order should be amended to delete the statement that the trial court ordered the sentence to be served concurrently with any other sentence Donald was presently serving.

## FALSE TESTIMONY

Donald Briggs asserts that the prosecutor presented false testimony. According to Mr. Briggs, the prosecutor testified that Roland Bernard, III, shot Stefan in the face and then testified that Donald and Stefan gunned down Mr. Bernard's father. Mr. Briggs contends the prosecutor knew these two instances involved open cases being investigated by Detective Trent Guidry of the Abbeville Police Department. Mr. Briggs further accuses the prosecutor of "craftily engaging a detective, who is actively conducting an investigation, prejudicing the jury by spe[a]king of a crime the defendant is possibly a person of interest [in] as if he has been duly convicted." Finally, Mr. Briggs asserts that this testimony was "basically being passed off as other crimes evidence in order to taint the minds of the jury[.]" For the reasons discussed below, we find that this assignment has not been preserved for review.

Although Mr. Briggs does not refer to any record pages, it appears that he is referring to the colloquy between the State and Detective Guidry regarding gun violence and animosity between two groups in Abbeville. When the State told the detective that "Group A" was affiliated with Roland Bernard, III, the State asked if the detective was familiar with that group. When the State referred the detective to "Group B," a defense attorney objected "as to relevance" and requested a sidebar. The transcript indicated that a bench conference was held without the court reported being present. The trial court then stated:

3

BY THE COURT: I need to rule on the objection for the record. I think the objection was relevance and that's overruled. I think the rest of it we've already decided. I mean, y'all are going to object if something else comes up.

BY MR. VIDAL: Correct.

The following colloquy ensued:

Q      Is there a Group B?

A      Yes.

Q      And to your knowledge, based on your investigation - - I'm, not talking about criminal activity. I'm just talking about association or affiliation - - is there a group which you know the Briggs brothers are associated with?

A      Yes.

Q      We'll call it Group B?

A      Sure.

Q      Is there animosity between Group A and Group B?

A      Yes.

Q      Is there gun violence between the groups?

A      Yes.

Q      I want to refer you to September of 2020. Did the Abbeville Police Department receive a report of a shooting where Stefan Briggs was wounded?

A      Yes.

Q      Do you know the details?

A      Vaguely, yes.

Q      Tell us.

A      Stefan and his brother, Donald, were traveling in a vehicle in the area of Martin Luther King and South Lamar Street. While they were traveling in the vehicle, a shooting took place. Stefan was shot in his hand and Donald drove him to the emergency room, dropped him off and went after the shooter.

Q      Did the Abbeville Police attempt to investigate that?

4

A       Yes.

Q       Was the victim cooperative?

A       No, sir.

Q       Were you able to determine who fired the shot?

A       No, sir.  There was a suspect mentioned as Roland Bernard, III.

Q       Let's move to November of 2020.  Roland Bernard, III's father was Roland Bernard, Jr.; is that correct?

A       Correct.

Q       And what happened to him in November of 2020?

A       He was executed in his driveway.

Q       Do you know any details about that?

A       He was shot numerous times in his driveway by - - it was by two different caliber - - two caliber casings were picked up indicating two shooters.

Q       Let's move to the next month, December of 2020.  Did you receive a report of another shooting involving Stefan Briggs?

A       Yes.

Q       What do you know about that?

A       During this incident, Donald and his brother, Stefan, were traveling in a vehicle in the area of Seventh Street - - Seventh or Eighth Street, South Louisiana area.  While they were traveling in the vehicle, shots were fired at the vehicle and Stefan was struck in his face with a 7.62 caliber rifle.

Detective Guidry testified that although an attempt to investigate was made by the Abbeville Police Department, Stefan was not cooperative.

First, Mr. Briggs's assertion that the prosecutor "testified" is incorrect. Although the prosecutor asked Detective Guidry leading questions, Detective Guidry was the one testifying.  Secondly, Mr. Briggs mischaracterizes Detective Guidry's testimony.  According to Mr. Briggs, there was testimony that Roland Bernard, III, shot Stefan in the face and that Donald and Stefan gunned down Mr.

5

Bernard's father, Roland Bernard, Jr. In actuality, Detective Guidry testified that Stefan was shot in the hand in one instance and shot in the face in another. Although Detective Guidry testified that Roland Bernard, III, was a suspect in the investigation of the gunshot to Stefan's hand, Detective Guidry by no means testified that Roland Bernard was the actual shooter and did not mention Roland Bernard with respect to the incident wherein Stefan was shot in the face. When Detective Guidry testified as to Roland Bernard, III's father being executed in his driveway, he mentioned that there appeared to be two shooters but stated nothing about Donald and Stefan being the shooters.

Although Mr. Briggs's argument that the testimony was "basically being passed off as other crimes evidence in order to taint the minds of the jury" could be a legitimate argument, it was not preserved for review. Defense counsel objected as to "relevance" with no mention of "other crimes evidence." After an unrecorded bench conference, the trial court announced that it overruled the objection. Defense counsel then agreed that he would object if something else came up. We have found no other objection based on other crimes evidence in the record.

Since there was no objection to other crimes evidence, the issue has not been preserved for review. La.Code Crim.P. art. 841. Even if "other crimes" was discussed in the bench conference, the transcript states the court reporter was not present. Since the court reporter was not present, the bench conference was presumably not recorded. Recently, this court stated the following regarding an unrecorded bench conference:

> The State argues that because Defendant's contention is solely based on an unrecorded bench conference, the assignment of error is founded entirely on speculation. Also, the State points out that Defendant neither requested that the bench conference be recorded nor objected on the record that it was not recorded. The State then further asserts that Defendant never sought to introduce evidence of the

6

victim's history. Finally, the State argues that even if Defendant had tried to introduce such evidence, it would have been inadmissible.

**Law and Analysis**

In *State v. Pinion*, 06-2346, p. 7 (La. 10/26/07), 968 So.2d 131, 134, the supreme court stated:

> This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843, which requires in felony cases the recording not only of the evidentiary portions of trial but also of "the examination of prospective jurors . . . and objections, questions, statements, and arguments of counsel." *State v. Hoffman*, 98-3118, p. 50 (La. 4/11/00), 768 So.2d 542, 586.

Continuing in *Pinion*, 968 So.2d at 134, the opinion stated, "The Court has instead, conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal."

It is equally well-accepted that in a criminal case an appellate court has no authority to receive or review evidence not contained in the trial court record. *State v. Oubichon*, 422 So.2d 1140 (La.1982); *State v. Turner*, 626 So.2d 890 (La.App. 3 Cir. 1993), *writ denied*, 93-3182 (La. 4/4/94), 635 So.2d 1122. After reviewing the briefs and the record in the present case, we contacted the district court asking it to supplement the record with a transcription of the bench conference. In response, the district court clerk's office advised us that the conference cannot be transcribed, as the record states, it was "AN OFF THE RECORD DISCUSSION."

In view of the response we received from the district court, it is evident that the contentions made by the State and Defendant are based solely upon speculation. As the record provides no facts on which to base any analysis, we have nothing to review.

*State v. Miller*, 23-554, pp. 13–15 (La.App. 3 Cir. 4/3/24), 387 So.3d 713, 722

(footnote omitted), *writ denied*, 24-560 (La. 10/15/24), 394 So.3d 816.

Likewise, the notation that the court reporter was not present during the bench

conference held in this case indicates the bench conference was not recorded.

Additionally, as in *Miller*, defense counsel did not request the bench conference be

recorded and did not object when it was not recorded. Thus, this court has nothing

to review regarding the allegation of other crimes evidence, and this assignment of error has not been preserved for review.

**MOTION FOR NEW TRIAL:**

Mr. Briggs contends the trial court erred in denying his motion for new trial, which alleged that Juror Laura Mouton failed to disclose that she was related to the victim. For the reasons discussed below, we find this assignment lacks merit.

On March 14, 2024, Mr. Briggs filed a "Motion for New Trial for Newly Discovered Evidence." He alleged that he recently learned that Juror Mouton failed to reveal on voir dire that she was related to the victim and had a close personal relationship with the victim's family. Had she disclosed this information, Mr. Briggs claimed Juror Mouton would have been challenged for cause. After hearing evidence at a hearing held March 28, 2024, the trial court denied the motion.

At the hearing, Keresha Levy, the victim's mother, testified that she had never met Juror Mouton and did not know of any relationship between Juror Mouton and the victim's dad, Whitney Allen, Jr. According to Ms. Levy, the victim's dad died in 2012 or 2013. On cross-examination, Ms. Levy testified that when she was five months pregnant with the victim, the victim's dad went to prison until the victim was six or seven years old. Ms. Levy agreed that the victim was eight or nine when his dad died in 2013, but the victim did visit his dad and paternal grandmother quite often. When asked who Onique Umini[1] was, Ms. Levy stated she was the victim's paternal aunt. According to Ms. Levy, Ms. Umini and the victim's dad had the same father but different mothers. When asked if she had ever met the victim's family in Kaplan, Ms. Levy replied, "No."

---

[1] Onique Umini is also referred to as Umini Caldwell. This court will refer to her as Ms. Umini.

8

Juror Mouton testified that Ms. Umini was her cousin and that they grew up together in Kaplan. According to Juror Mouton, she and Ms. Umini saw each other at family reunions. Juror Mouton identified a picture from a March 26, 2018 Facebook post that stated, "Laura Mouton is feeling loved with Onique Umini and Shawn Mouton." Juror Mouton also wrote, "[m]y cousins" below the picture. When asked when she learned that the victim (Ms. Umini's nephew) passed away, Juror Mouton responded:

> A I don't remember, but I saw - - I mean, whenever I came to court, that's whenever I found out that that was her nephew - - after court was done, I found out that was her nephew on her daddy's side.
>
> Q So despite growing up with her, knowing her family history, you had no idea? Is that what you're testifying today, that you had no idea that she had a nephew named Jazaylon?
>
> A No, I didn't know - - I don't know who that - - I didn't know that that was her nephew, no.
>
> Q As she - - was Ms. Umini present at all during the trial to your knowledge?
>
> A Not when I was here.

Looking at Ms. Umini's Facebook page, Juror Mouton identified a picture of Ms. Umini and a person she believed to be the victim. The following colloquy ensued:

> Q So it's your testimony today - - I just want to make sure I understand - - that at no time did you, through Facebook or any other means realize that Umini had lost a nephew?
>
> A I didn't know that was her nephew.
>
> Q That wasn't my question. At any time, did you realize that Umini had lost a nephew?
>
> A Yeah.

Juror Mouton also testified that the victim's father was also father to her godchild. Even so, Juror Mouton maintained that at the beginning of the case, she

had no knowledge of anyone involved in the case. When asked when she became aware that she might know someone in the trial, Juror Mouton responded:

A     After everything was over with.

Q     When?

A     What you mean?

Q     Well, when? I mean, the day after it ended, the day - - a week later?

A     Oh, yeah, it was - - it might have been the day after I found out.

Q     So almost immediately. How did you find out?

A     Because I was talking to people about it.

Q     And you never talked to people about it before the trial?

A     Uh-uh (negative response).

Q     When it happened, you never talked to anybody?

A     No, whenever I was asked did I know anybody from either side - - they asked the little boy - - I don't know him or his mama. I don't know that family. And then they asked if I knew these two right here. I don't know them either.

When questioned by the State regarding her relationship with Ms. Umini, Juror Mouton testified that their grandmothers were third or fourth cousins, making her and Ms. Umini fifth or sixth cousins. Juror Mouton testified that she had no family relationship with the victim's father. At trial, Juror Mouton did not hear Ms. Umini's name mentioned nor did she hear the name of the victim's father.

According to Juror Mouton, her first time seeing the victim's face was when the State displayed his picture at trial. At that time, Juror Mouton had no idea who the victim was, who his mother was, or who his grandmother was. The following colloquy ensued:

Q     If you had known somebody involved in the case, you would have told the judge, wouldn't you?

A     Right.

Q     And learning about these facts afterwards had nothing to do with your decision in the case?

A     No.

Q     When you swore under oath that you didn't know anybody involved in the case, you were telling the truth?

A     Yes.

Q     And just because you're on Facebook with people - - a lot of people probably - - and you're on Facebook with Umini doesn't mean you knew anything about her nephew being killed in 2020, did you?

A     No.

Q     She never talked to you about it?

A     Uh-uh (negative response).

Q     Was there any reason why you would have been biased in this case?

A     No.

Defense clarified with Juror Mouton that before trial, she did know that Ms. Umini had lost a nephew to murder but had not put "two and two together . . . as [she] sat on the jury."

In its ruling, the trial court found the biological relationship between Juror Mouton and Ms. Umini was tenuous at best and found no evidence of a relationship between Juror Mouton and the victim's father or mother. Additionally, the trial court found Juror Mouton did not know the victim "and only found out after the trial that the victim was the nephew of somebody that she knew and somebody that she is very, very distantly related to." Finally, the trial court stated the following:

> But all that being said, the Court finds that the defendants did not present anything to the Court to show that there was a relationship, that Ms. Mouton concealed any type of relationship, that there was any actual or implied bias on the part of the juror. And all that being said, the Court is going to deny the motion for new trial.

11

Mr. Briggs asserts that Juror Mouton not only knew the victim through "some loose association," but she was biologically related to the victim's aunt. He argues:

> Mouton knew the victim, knew the defendant, suspending any hypothesis of innocence, and had an already predisposed conviction of guilt. She sat [sic] out to sit on this jury and convict. Becoming the jury foreperson, there is no way of knowing how much influence she had on other jurors and their vote.

Juror Mouton's relationship, Mr. Briggs contends, was "more than enough to imply biasness to Laura Mouton, therefore rendering the [trial] unfair and partial, violating the defendant[']s right to a fair trial, and leaving no confidence in the fair outcome of the trial." According to Mr. Briggs, being a relative of the victim requires an automatic disqualification under La.Code Crim.P. art. 797.

In *State v. Cooley*, 11-959 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, *writ denied*, 12-1008 (La. 10/26/12), 99 So.3d 640, this court reviewed the denial of a motion for new trial, which alleged that a juror made a false statement during voir dire. The juror in *Cooley*, Francis Powell, answered "no" to a question on the voir dire questionnaire asking whether the juror, the juror's family member, or the juror's close acquaintance had been a victim of sexual abuse. *Id.* at 289. Cooley's attorney alleged that after the verdict, he learned that Juror Powell's brother had been investigated for sexually assaulting his niece and his biological daughter. *Id.* At a hearing on Cooley's motion for new trial, there was testimony that the niece who accused Juror Powell's brother was not related to Juror Powell as she was the niece of the brother's wife by blood relation. *Id.* at 290. There was also testimony that the daughter of Juror Powell's brother made the allegations to an unknown source, and no investigation or arrest had been made in Beauregard Parish. *Id.*

This court addressed Cooley's motion for new trial as follows:

> If a false statement of a juror on voir dire is discovered during trial, the defendant may move for a mistrial, and the motion may be granted if the defendant was prevented from receiving a fair trial.

12

La.Code Crim.P. art. 775. In a post-trial context, the matter can be raised in a motion for new trial.

> The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

> The court, on motion of the defendant, shall grant a new trial whenever:

> (1) The verdict is contrary to the law and the evidence;

> (2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;

> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;

> (4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or

> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

La.Code Crim.P. art. 851.

"The motion for new trial is based upon the supposition, and requires a showing, that injustice has been done the defendant. La.C.Cr.P. art. 851. Regarding the misstatements of jurors, the defendant must show that he was prejudiced by the misstatement for a new trial to be warranted." *State v. Johnson,* 32,910, p. 5 (La.App. 2 Cir. 1/26/00), 750 So.2d 398, 403–04, *writ denied,* 00–911 (La.11/3/00), 773 So.2d 140.

First, as argued by the State, Cooley was not prevented from having a full and adequate voir dire as he has failed to show that either the State or the trial court placed unreasonable limitations on the voir dire examination by the defense:

13

> As a general matter, an accused in a criminal case is constitutionally entitled to a full and complete voir dire examination. La. Const. Art. I, § 17. The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercise of cause and peremptory challenges. The scope of voir dire is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion.

*State v. Ball,* 00–2277, p. 23 (La.1/25/02), 824 So.2d 1089, 1110, *cert. denied,* 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002) (citation omitted).

> Second, Cooley failed to establish that Juror Powell actually lied in response to the inquiry on the jury questionnaire. The testimony of Robert McCullough was the only evidence either proffered or offered to prove the truth of the matter asserted. The niece whose complaints were investigated during the first case, the charges of which Rexford Powell was acquitted, was not the niece of Juror Powell because the niece was only related to Rexford Powell through his wife.

> Further, Mr. McCullough was not involved in the second investigation; he learned only that Rexford Powell's daughter had alleged to an unknown source that her father had molested her. Thus, it appears as if Mr. McCullough had only heard rumors that such sexual misconduct had occurred. As Rexford Powell was never investigated for, arrested for, charged with, or prosecuted for sexual misconduct with his daughter, the rumors were never proven or substantiated. Thus, Cooley failed to establish that Juror Powell intentionally misled the court when he answered "no" to the question asking if he, any family member, or close acquaintance had been the victim of a sex crime.

> Finally, assuming, arguendo, that Juror Powell was aware of the rumor concerning his brother and his brother's daughter, Cooley failed to show that he was prejudiced by or suffered injustice as a result of the misinformation. Cooley did not show whether Juror Powell believed his brother guilty of the misconduct, whether Juror Powell's impartiality was affected by sympathy for his niece, or whether Juror Powell influenced his fellow jury members to find Cooley guilty.

> Accordingly, this assertion is without merit.

*Id*. at 290–91.

As in *Cooley*, Mr. Briggs makes no allegation that either the State or the trial court placed unreasonable limitations on his voir dire examination. Additionally, Mr. Briggs fails to establish that Juror Mouton lied during the voir dire. Although

14

he claims Juror Mouton purposely concealed her relationship to the victim in order to assure his conviction, Juror Mouton was adamant in her testimony at the motion for new trial hearing that she did not learn of her connection to the victim until after trial. Finally, Mr. Briggs fails to show he was prejudiced by Juror Mouton's failure to disclose her connection to the victim. As the trial court found in its ruling, the biological relationship between Juror Mouton and the victim's aunt was tenuous at best. Thus, even assuming for the sake of argument that Juror Mouton realized her connection, Mr. Briggs fails to show Juror Mouton's impartiality was affected by the connection or that she influenced the other jurors. Accordingly, this assignment of error lacks merit.

IV.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant Donald Briggs are affirmed. We order that the sentencing minutes and Uniform Sentencing Commitment Order be amended to delete the statement that the trial court ordered the sentence to be served concurrently with any other sentence Defendant was presently serving.

**AFFIRMED.**

# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-492 consolidated with 24-490


STATE OF LOUISIANA

VERSUS

STEFAN JERMAINE BRIGGS
A/K/A STEFAN BRIGGS


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILLION, NO. 69263
HONORABLE THOMAS J. FREDERICK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ON REMAND FROM
THE LOUISIANA SUPREME COURT
NO. 2025-K-00529

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.


**AFFIRMED.**

**Aaron M. Meche**
**Assistant District Attorney**
**15th Judicial District, Vermilion Parish**
**100 N. State Street, Ste. 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Holli Herrle-Castillo**
**Louisiana Appellate Project**
**P. O. Box 2333**
**Marrero, LA 70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Stefan Jermaine Briggs**

**WILSON, Judge.**

This matter comes before the court on remand from the Louisiana Supreme Court to consider the pretermitted assignments of error after the supreme court reversed this court's decision and reinstated the conviction and life sentence of Defendant, Stefan Briggs, for second-degree murder. *State v. Briggs*, 25-529 (La. 5/1/26), 432 So.3d 167. For the following reasons, we affirm the conviction and sentence.

I.

## ISSUES

We must decide:

(1) whether the trial court erred in denying the motion for new trial; and

(2) whether the trial court erred in overruling the defense's objection to the evidence of uncharged other crimes.

II.

## FACTS AND PROCEDURAL HISTORY

On July 14, 2022, Jazaylon Levy was shot while walking outside of an apartment in the Stone Bridge Apartment complex in Abbeville, Louisiana. He later died from his injuries. On October 31, 2022, Stefan Briggs and his brother, Donald Briggs, were each charged by a single grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1. A two-day jury trial commenced on August 29, 2023, after which both Stefan and Donald were found guilty as charged.

On March 28, 2024, the trial court denied Stefan's post verdict judgment of acquittal and motion for new trial. After waiving sentencing delays, both Stefan and Donald were sentenced to life imprisonment at hard labor without benefit of parole,

probation or suspension of sentence. On April 8, 2024, Stefan Briggs, through counsel, filed a notice of appeal which was granted the same day.

This court reversed the convictions and sentences of both Defendants based on insufficient circumstantial evidence. *State v. Briggs*, 24-490 (La.App. 3 Cir. 4/2/25), 409 So.3d 399. The State proceeded to the supreme court, which reversed this court's decision and reinstated the conviction and sentence for each Defendant. The supreme court found this court erred in substituting its verdict for that of the jury and remanded for this court to consider the pretermitted assignments of error. *Briggs*, 432 So.3d 167.

III.

**LAW AND DISCUSSION**

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

There is a conflict between the sentencing minutes, Uniform Sentencing Commitment Order, and the transcript of sentencing. Both the minutes of sentencing and the Uniform Sentencing Commitment Order state the trial court ordered Stefan's sentence to run concurrently with any other sentence he was presently serving. No such statement, however, is reflected in the transcript. This conflict is to be resolved in favor of the transcript. *See State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Thus, the sentencing minutes and commitment order should be amended to delete the statement that the trial court ordered the sentence to be served concurrently with any other sentence Stefan was presently serving.

2

## MOTION FOR NEW TRIAL

Stefan Briggs contends the trial court should have granted his motion for new trial based upon newly discovered evidence. On March 14, 2024, Mr. Briggs filed a "Motion for New Trial for Newly Discovered Evidence." He alleged that he recently learned that Juror Laura Mouton failed to reveal in voir dire that she was related to the victim and had a close personal relationship with the victim's family. Had she disclosed this information, Mr. Briggs claimed Juror Mouton would have been challenged for cause. After hearing evidence at a hearing held March 28, 2024, the trial court denied the motion.

Mr. Briggs asserts that during voir dire, Juror Mouton denied knowing or being related to any parties involved in the case. After trial, Mr. Briggs contends, it became apparent that Juror Mouton was actually related to the victim. According to Mr. Briggs, Juror Mouton's testimony at the motion for new trial hearing was "suspect and inconsistent, casting doubt on the veracity not only of her testimony at the hearing, but of all of her voir dire responses." Had Juror Mouton disclosed her relationship, Mr. Briggs contends that she would have been challenged for cause, or at the least stricken by a peremptory challenge.

The State contends that it was "quite obvious" that Juror Mouton did not know the victim and was not aware before trial of the victim's relation to her distant cousin, Umini Caldwell. [1] The State also argues that Mr. Briggs's counsel failed to prove he exercised due diligence to discover Juror Mouton's relationship:

> Appellant's counsel, during voir dire, had the opportunity to question each potential juror to ascertain any vital information that may exclude them from sitting on the jury. Counsel did not ask any questions of that effect to juror Mouton, then went on to accept her as a juror.
>
> Due diligence in this particular situation would have been to further delve into each potential juror's background to ascertain these

---

[1] Umini Caldwell is also referred to as Onique Umini. We will refer to her as Ms. Umini.

vital bits of information. No effort was made by Appellant's counsel to further question juror Mouton during voir dire. No attestation of reasonable diligence was made.

Keresha Levy, the victim's mother, testified that she had never met Juror Mouton and did not know of any relationship between Juror Mouton and the victim's dad, Whitney Allen, Jr. According to Ms. Levy, the victim's dad died in 2012 or 2013. On cross-examination, Ms. Levy testified that when she was five months pregnant with the victim, when the victim's dad went to prison until the victim was six or seven years old. Ms. Levy agreed that the victim was eight when his dad died in 2013, but the victim did visit his dad and paternal grandmother quite often. When asked who Ms. Umini was, Ms. Levy stated she was the victim's paternal aunt. According to Ms. Levy, Ms. Umini and the victim's dad had the same father but different mothers. When asked if she had ever met the victim's family in Kaplan, Ms. Levy replied, "No."

Juror Mouton testified that Ms. Umini was her cousin and that they grew up together in Kaplan. According to Juror Mouton, she and Ms. Umini saw each other at family reunions. Juror Mouton identified a picture from a March 26, 2018 Facebook post that stated, "Laura Mouton is feeling loved with Onique Umini and Shawn Mouton." Juror Mouton also wrote, "[m]y cousins" below the picture. When asked when she learned that the victim (Ms. Umini's nephew) passed away, Juror Mouton responded:

> A     I don't remember, but I saw - - I mean, whenever I came to court, that's whenever I found out that that was her nephew - - after court was done, I found out that was her nephew on her daddy's side.
>
> Q     So despite growing up with her, knowing her family history, you had no idea? Is that what you're testifying today, that you had no idea that she had a nephew named Jazaylon?
>
> A     No, I didn't know - - I don't know who that - - I didn't know that that was her nephew, no.

4

Q     As she - - was Ms. Umini present at all during the trial to your knowledge?

A     Not when I was here.

Looking at Ms. Umini's Facebook page, Juror Mouton identified a picture of Ms. Umini and a person she believed to be the victim.  The following colloquy ensued:

Q     So it's your testimony today - - I just want to make sure I understand - - that at no time did you, through Facebook or any other means realize that Umini had lost a nephew?

A     I didn't know that was her nephew.

Q     That wasn't my question.  At any time, did you realize that Umini had lost a nephew?

A     Yeah.

Juror Mouton also testified that the victim's father was also father to her godchild.  Even so, Juror Mouton maintained that at the beginning of the case, she had no knowledge of anyone involved in the case.  When asked when she became aware that she might know someone in the trial, Juror Mouton responded:

A     After everything was over with.

Q     When?

A     What you mean?

Q     Well, when?  I mean, the day after it ended, the day - - a week later?

A     Oh, yeah, it was - - it might have been the day after I found out.

Q     So almost immediately.  How did you find out?

A     Because I was talking to people about it.

Q     And you never talked to people about it before the trial?

A     Uh-uh (negative response).

Q     When it happened, you never talked to anybody?

5

A    No, whenever I was asked did I know anybody from either side - - they asked the little boy - - I don't know him or his mama. I don't know that family. And then they asked if I knew these two right here. I don't know them either.

When questioned by the State regarding her relationship with Ms. Umini, Juror Mouton testified that their grandmothers were third or fourth cousins, making her and Ms. Umini fifth or sixth cousins. Juror Mouton testified that she had no family relationship with the victim's father. At trial, Juror Mouton did not hear Ms. Umini's name mentioned nor did she hear the name of the victim's father.

According to Juror Mouton, her first time to see the victim's face was when the State displayed his picture at trial. At that time, Juror Mouton had no idea who the victim was, who his mother was, or who his grandmother was. The following colloquy ensued:

Q    If you had known somebody involved in the case, you would have told the judge, wouldn't you?

A    Right.

Q    And learning about these facts afterwards had nothing to do with your decision in the case?

A    No.

Q    When you swore under oath that you didn't know anybody involved in the case, you were telling the truth?

A    Yes.

Q    And just because you're on Facebook with people - - a lot of people probably - - and you're on Facebook with Umini doesn't mean you knew anything about her nephew being killed in 2020, did you?

A    No.

Q    She never talked to you about it?

A    Uh-uh (negative response).

Q    Was there any reason why you would have been biased in this case?

6

A     No.

Defense counsel clarified with Juror Mouton that before trial, she did know that Ms. Umini had lost a nephew to murder but had not put "two and two together . . . as [she] sat on the jury."

In its ruling, the trial court found the biological relationship between Juror Mouton and Ms. Umini was tenuous at best and found no evidence of a relationship between Juror Mouton and the victim's father or mother. Additionally, the trial court found Juror Mouton did not know the victim "and only found out after the trial that the victim was the nephew of somebody that she knew and somebody that she is very, very distantly related to." Finally, the trial court stated the following:

> But all that being said, the Court finds that the defendants did not present anything to the Court to show that there was a relationship, that Ms. Mouton concealed any type of relationship, that there was any actual or implied bias on the part of the juror. And all that being said, the Court is going to deny the motion for new trial.

In *State v. Cooley*, 11-959 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, *writ denied*, 12-1008 (La. 10/26/12), 99 So.3d 640, this court reviewed the denial of a motion for new trial, which alleged that a juror made a false statement during voir dire. The juror in *Cooley*, Francis Powell, answered "no" to a question on the voir dire questionnaire asking whether the juror, the juror's family member, or the juror's close acquaintance had been a victim of sexual abuse. *Id.* at 289. Cooley's attorney alleged that after the verdict, he learned that Juror Powell's brother had been investigated for sexually assaulting his niece and his biological daughter. *Id.* At a hearing on Cooley's motion for new trial, there was testimony that the niece who accused Juror Powell's brother was not related to Juror Powell as she was the niece of the brother's wife by blood relation. *Id.* at 290. There was also testimony that the daughter of Juror Powell's brother made the allegations to an unknown source, and no investigation or arrest had been made in Beauregard Parish. *Id.*

7

This court addressed Cooley's motion for new trial as follows:

If a false statement of a juror on voir dire is discovered during trial, the defendant may move for a mistrial, and the motion may be granted if the defendant was prevented from receiving a fair trial. La.Code Crim.P. art. 775. In a post-trial context, the matter can be raised in a motion for new trial.

> The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

> The court, on motion of the defendant, shall grant a new trial whenever:

> (1) The verdict is contrary to the law and the evidence;

> (2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;

> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;

> (4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or

> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

La.Code Crim.P. art. 851.

"The motion for new trial is based upon the supposition, and requires a showing, that injustice has been done the defendant. La.C.Cr.P. art. 851. Regarding the misstatements of jurors, the defendant must show that he was prejudiced by the misstatement for a new trial to be warranted." *State v. Johnson,* 32,910, p. 5 (La.App. 2 Cir. 1/26/00), 750 So.2d 398, 403–04, *writ denied,* 00–911 (La. 11/3/00), 773 So.2d 140.

8

First, as argued by the State, Cooley was not prevented from having a full and adequate voir dire as he has failed to show that either the State or the trial court placed unreasonable limitations on the voir dire examination by the defense:

> As a general matter, an accused in a criminal case is constitutionally entitled to a full and complete voir dire examination. La. Const. Art. I, § 17. The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercise of cause and peremptory challenges. The scope of voir dire is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion.

*State v. Ball,* 00–2277, p. 23 (La.1/25/02), 824 So.2d 1089, 1110, *cert. denied,* 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002) (citation omitted).

Second, Cooley failed to establish that Juror Powell actually lied in response to the inquiry on the jury questionnaire. The testimony of Robert McCullough was the only evidence either proffered or offered to prove the truth of the matter asserted. The niece whose complaints were investigated during the first case, the charges of which Rexford Powell was acquitted, was not the niece of Juror Powell because the niece was only related to Rexford Powell through his wife.

Further, Mr. McCullough was not involved in the second investigation; he learned only that Rexford Powell's daughter had alleged to an unknown source that her father had molested her. Thus, it appears as if Mr. McCullough had only heard rumors that such sexual misconduct had occurred. As Rexford Powell was never investigated for, arrested for, charged with, or prosecuted for sexual misconduct with his daughter, the rumors were never proven or substantiated. Thus, Cooley failed to establish that Juror Powell intentionally misled the court when he answered "no" to the question asking if he, any family member, or close acquaintance had been the victim of a sex crime.

Finally, assuming, arguendo, that Juror Powell was aware of the rumor concerning his brother and his brother's daughter, Cooley failed to show that he was prejudiced by or suffered injustice as a result of the misinformation. Cooley did not show whether Juror Powell believed his brother guilty of the misconduct, whether Juror Powell's impartiality was affected by sympathy for his niece, or whether Juror Powell influenced his fellow jury members to find Cooley guilty.

Accordingly, this assertion is without merit.

*Id*. at 290–91.

As in *Cooley*, Mr. Briggs makes no allegation that either the State or the trial court placed unreasonable limitations on his voir dire examination. Additionally, Mr. Briggs fails to establish that Juror Mouton lied during the voir dire. Although he claims Juror Mouton purposely concealed her relationship to the victim in order to assure his conviction, Juror Mouton was adamant in her testimony at the motion for new trial hearing that she did not learn of her connection to the victim until after trial. Despite Mr. Briggs's claim that Juror Mouton's testimony was "suspect and inconsistent," the trial court believed that Juror Mouton learned after trial that the victim was the nephew of someone Juror Mouton knew and was distantly related to. As the trier of fact at the motion for new trial hearing, it was the trial judge's role to weigh the credibility of a witness's testimony. Finally, Mr. Briggs fails to show he was prejudiced by Juror Mouton's failure to disclose her connection to the victim. As the trial court found in its ruling, the biological relationship between Juror Mouton and the victim's aunt was tenuous at best. Thus, even assuming for the sake of argument that Juror Mouton realized her connection, Mr. Briggs fails to show Juror Mouton's impartiality was affected by the connection or that she influenced the other jurors.

Accordingly, this assignment of error lacks merit.

**OTHER CRIMES EVIDENCE:**

Mr. Briggs claims the State was allowed to present testimony, over defense counsel's objection, of "alleged other crimes and gang activity associated with the appellant." Mr. Briggs contends the State did not provide notice that it intended to present this testimony, and no hearing was held to determine its admissibility. According to Mr. Briggs, Detective Trent Guidry of the Abbeville Police Department testified as to the other crimes evidence without any supporting evidence. The erroneous admission was exacerbated by the State's closing

argument, he contends, "which focused as much on the other crimes allegations as it did on the scant evidence presented." Finally, Mr. Briggs asserts that the erroneous admission of the other crimes evidence was not harmless error in light of the scant circumstantial evidence presented.

The State asserts that it did not provide notice of its intent to introduce other crimes evidence, because it had no intention of introducing such evidence. According to the State, Detective Guidry described two different shootings where Stefan was the victim and described another shooting involving "two shooters" but did not name the Briggs brothers as suspects. Finally, the State contends that it made no attempt to introduce evidence of gang activity involving the Briggs brothers as it made no mention of gangs or gang war.

During Detective Guidry's testimony, the State asked the detective if he was familiar with a group (Group A) that was associated with Roland Bernard, III. When Detective Guidry responded, "[y]es," the State referred the detective to "Group B," at which time defense counsel objected "as to relevance" and requested a sidebar. The transcript indicates that a bench conference was held without the court reporter present. The trial court then stated:

> BY THE COURT: I need to rule on the objection for the record. I think the objection was relevance and that's overruled. I think the rest of it we've already decided. I mean, y'all are going to object if something else comes up.
>
> BY MR. VIDAL: Correct.

The following colloquy ensued:

Q    Is there a Group B?

A    Yes.

Q    And to your knowledge, based on your investigation - - I'm, not talking about criminal activity. I'm just talking about association or

11

affiliation - - is there a group which you know the Briggs brothers are associated with?

A     Yes.

Q     We'll call it Group B?

A     Sure.

Q     Is there animosity between Group A and Group B?

A     Yes.

Q     Is there gun violence between the groups?

A     Yes.

Q     I want to refer you to September of 2020. Did the Abbeville Police Department receive a report of a shooting where Stefan Briggs was wounded?

A     Yes.

Q     Do you know the details?

A     Vaguely, yes.

Q     Tell us.

A     Stefan and his brother, Donald, were traveling in a vehicle in the area of Martin Luther King and South Lamar Street. While they were traveling in the vehicle, a shooting took place. Stefan was shot in his hand and Donald drove him to the emergency room, dropped him off and went after the shooter.

Q     Did the Abbeville Police attempt to investigate that?

A     Yes.

Q     Was the victim cooperative?

A     No, sir.

Q     Were you able to determine who fired the shot?

A     No, sir. There was a suspect mentioned as Roland Bernard, III.

Q     Let's move to November of 2020. Roland Bernard, III's father was Roland Bernard, Jr.; is that correct?

A     Correct.

Q    And what happened to him in November of 2020?

A    He was executed in his driveway.

Q    Do you know any details about that?

A    He was shot numerous times in his driveway by - - it was by two different caliber - - two caliber casings were picked up indicating two shooters.

Q    Let's move to the next month, December of 2020. Did you receive a report of another shooting involving Stefan Briggs?

A    Yes.

Q    What do you know about that?

A    During this incident, Donald and his brother, Stefan, were traveling in a vehicle in the area of Seventh Street - - Seventh or Eighth Street, South Louisiana area. While they were traveling in the vehicle, shots were fired at the vehicle and Stefan was struck in his face with a 7.62 caliber rifle.

Although an attempt to investigate was made by the Abbeville Police Department, Stefan was not cooperative. Detective Guidry testified that in his experience and expertise, a shooting victim's failure to cooperate indicates "[p]otential retaliation." The State then asked Detective Guidry about Gavin Garnica, a person with the victim at the time of the shooting. Detective Guidry testified that he was familiar with Gavin and testified that Gavin was affiliated with Roland Bernard, III's group.

As Mr. Briggs argues, the State's closing argument referred to the violence between the two groups as well as Gavin Garnica's association with Roland Bernard's group. The State argued to the jury that the Briggs brothers were shooting at Gavin Garnica when the victim was shot.

Although the State used the word "groups" instead of "gangs," it was obvious the State was referring to gangs and gang violence. However, whether this constituted an erroneous reference to other crimes evidence is not properly before

13

the court for review. Defense counsel objected as to "relevance" with no mention of "other crimes evidence." After an unrecorded bench conference, the trial court announced that it overruled the objection. Defense counsel then agreed that he would object if something else came up. We have found no other objection based on other crimes evidence in the record.

Since there was no objection to other crimes evidence, the issue has not been preserved for review. La.Code Crim.P. art. 841. Even if "other crimes" was discussed in the bench conference, the transcript states the court reporter was not present. Since the court reporter was not present, the bench conference was presumably not recorded. Recently, this court stated the following regarding an unrecorded bench conference:

> The State argues that because Defendant's contention is solely based on an unrecorded bench conference, the assignment of error is founded entirely on speculation. Also, the State points out that Defendant neither requested that the bench conference be recorded nor objected on the record that it was not recorded. The State then further asserts that Defendant never sought to introduce evidence of the victim's history. Finally, the State argues that even if Defendant had tried to introduce such evidence, it would have been inadmissible.

### Law and Analysis

In *State v. Pinion*, 06-2346, p. 7 (La. 10/26/07), 968 So.2d 131, 134, the supreme court stated:

> This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843, which requires in felony cases the recording not only of the evidentiary portions of trial but also of "the examination of prospective jurors . . . and objections, questions, statements, and arguments of counsel." *State v. Hoffman*, 98-3118, p. 50 (La. 4/11/00), 768 So.2d 542, 586.

Continuing in *Pinion*, 968 So.2d at 134, the opinion stated, "The Court has instead, conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal."

14

It is equally well-accepted that in a criminal case an appellate court has no authority to receive or review evidence not contained in the trial court record. *State v. Oubichon*, 422 So.2d 1140 (La.1982); *State v. Turner*, 626 So.2d 890 (La.App. 3 Cir. 1993), *writ denied*, 93-3182 (La. 4/4/94), 635 So.2d 1122. After reviewing the briefs and the record in the present case, we contacted the district court asking it to supplement the record with a transcription of the bench conference. In response, the district court clerk's office advised us that the conference cannot be transcribed, as the record states, it was "AN OFF THE RECORD DISCUSSION."

In view of the response we received from the district court, it is evident that the contentions made by the State and Defendant are based solely upon speculation. As the record provides no facts on which to base any analysis, we have nothing to review.

*State v. Miller*, 23-554, pp. 13–15 (La.App. 3 Cir. 4/3/24), 387 So.3d 713, 722 (footnote omitted), *writ denied*, 24-560 (La. 10/15/24), 394 So.3d 816.

Likewise, the notation that the court reporter was not present during the bench conference held in this case indicates the bench conference was not recorded. Additionally, as in *Miller*, defense counsel did not request the bench conference be recorded and did not object when it was not recorded. Thus, this court has nothing to review with regard to Mr. Briggs's allegation of other crimes evidence, and this assignment of error has not been preserved for review.

IV.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant Stefan Briggs are affirmed. We order that the sentencing minutes and Uniform Sentencing Commitment Order be amended to delete the statement that the trial court ordered the sentence to be served concurrently with any other sentence Defendant was presently serving.

**AFFIRMED.**